02-12-116-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00116-CV

 

 


 
 
 Texas
 Department of Criminal Justice
  
 v.
  
 Bonnie
 Ledbetter, Individually and as Representative of the Estate of John
 Ledbetter, and Freddie Ledbetter, Callie Ledbetter, Amber Bogusch, Ashley
 Ledbetter, and John Ledbetter, Jr.
 
 
 §
  
  
 §
  
  
 §
  
  
 §
  
 
 
 From the 342nd District
 Court
  
  
 of
 Tarrant County (342-246350-10)
  
  
 December
 21, 2012
  
  
 Opinion
 by Justice Gardner
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s order.  It is ordered that the order of the trial
court is affirmed.

It
is further ordered that appellant Texas Department of Criminal
Justice shall pay all costs of this appeal, for which let execution issue.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Anne Gardner

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00116-CV

 

 


 
 
 Texas Department of Criminal Justice
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Bonnie Ledbetter, Individually and as
 Representative of the Estate of John Ledbetter, and Freddie Ledbetter, Callie
 Ledbetter, Amber Bogusch, Ashley Ledbetter, and John Ledbetter, Jr.
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE 342nd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

          The
Texas Department of Criminal Justice (the Department) appeals the trial court’s
partial denial of its plea to the jurisdiction in the wrongful death lawsuit
filed against it by Appellee Bonnie Ledbetter, Individually and as
Representative of the Estate of John Ledbetter, and Freddie Ledbetter, Callie
Ledbetter, Amber Bogusch, Ashley Ledbetter, and John Ledbetter, Jr.
(collectively, Ledbetter).  The Department contends in one issue that the trial
court erred by denying the Department’s plea to the jurisdiction because there
is no evidence that the use of tangible personal property proximately caused
John Ledbetter’s death.  We affirm.

II. 
Procedural History

          Ledbetter
filed this suit in June 2010.  She alleges in her fifth amended petition that
her son John Ledbetter (John) died while in the Department’s custody and that
the Department is liable for his death because the Department’s employees used
or misused a transport van, handcuffs, and restraints.  More specifically,
Ledbetter alleges that on June 27, 2008, John was not coherent and vomited in
his cell.  Department correctional officers transported John by van to another
prison facility for evaluation and did not call for an ambulance so that John
could be taken to a hospital.  Prior to laying John on the backseat of the van,
the officers placed him in handcuffs and belly and ankle cuffs with a chain
running between his hands, belly chain, and ankles.  Ledbetter alleges that,
because of the restraints, John “could not move him self as needed to take care
of himself when vomiting.”  Ledbetter further alleges that “[w]hen John arrived
at the Robertson Unit, the nurses immediately saw that John was not breathing
and started CPR[,] but it was too late.  The misuse of the restraints, which
were placed on John by employees, agents and servants of [the Department] . . .
[was] a direct and proximate cause of John’s death.”  “John died because he
aspirated vomit.”

          The
Department filed its plea to the jurisdiction in September 2011, and the trial
court conducted a hearing in February 2012.  The appellate record does not
contain a written response by Ledbetter, but we note that there are several
witness statements attached to Ledbetter’s fifth amended petition.  The trial
court granted the Department’s plea to the jurisdiction in part as to
Ledbetter’s allegations concerning the use or misuse of the transport van but
also denied the plea to the jurisdiction in part.  As to the partial denial,
the trial court’s order states that “[t]he case will proceed under the Texas
Tort Claims Act solely predicated upon the alleged use or misuse of
restraints.”  This interlocutory appeal by the Department followed.[2] 
See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp.
2012).

III. 
Standard of Review

          Whether
the trial court has subject-matter jurisdiction is a question of law that we
review de novo.  Tex. Natural Res. Conservation Comm’n v. IT-Davy, 74
S.W.3d 849, 855 (Tex. 2002).  A plea to the jurisdiction is a dilatory plea
that challenges the trial court’s subject-matter jurisdiction.  Bland Indep.
Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000).  It is used to defeat a
cause of action without regard to whether the claims asserted have merit.  Id.

          The
plaintiff has the burden of alleging facts that affirmatively establish the
trial court’s subject-matter jurisdiction.  Tex. Ass’n of Bus. v. Tex. Air
Control Bd., 852 S.W.2d 440, 446 (Tex. 1993).  We construe the pleadings
liberally in favor of the plaintiff, look to the pleader’s intent, and accept
the pleadings’ factual allegations as true.  Tex. Dep’t of Parks &
Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004).  If, as in this case,
a plea to the jurisdiction challenges the existence of jurisdictional facts, we
consider relevant evidence submitted by the parties that is necessary to
resolve the jurisdictional issues.  Id. at 227; Bland, 34 S.W.3d
at 555.

          The
plea to the jurisdiction standard generally mirrors that of a traditional
motion for summary judgment.  Miranda, 133 S.W.3d at 228; see Tex.
R. Civ. P. 166a(c).  The governmental unit is required to meet the summary
judgment standard of proof for its assertion that the trial court lacks
jurisdiction.  Miranda, 133 S.W.3d at 228.  Once the governmental unit
meets its burden, the plaintiff is then required to show there is a disputed
material fact regarding the jurisdictional issue.  Id.  We take as true
all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant’s favor.  Wise Reg’l
Health Sys. v. Brittain, 268 S.W.3d 799, 805 (Tex. App.—Fort Worth 2008, no
pet.) (citing Miranda, 133 S.W.3d at 228).  If the evidence creates a
fact question regarding jurisdiction, the trial court must deny the plea to the
jurisdiction and leave its resolution to the factfinder.  Miranda, 133
S.W.3d at 227–28.  But if the evidence is undisputed or fails to raise a fact
question on the jurisdictional issue, the trial court rules on the plea to the
jurisdiction as a matter of law.  Id. at 228.

IV. 
Sovereign Immunity

          The
Department asserts that it is entitled to sovereign immunity from suit. Unless
waived by the State, sovereign immunity from suit defeats a trial court’s
subject-matter jurisdiction.  Id. at 225–26.  Relevant to this case,
section 101.021(2) of the Tort Claims Act waives immunity only for personal
injury and death “caused by a condition or use of tangible personal or real
property if the governmental unit would, were it a private person, be liable to
the claimant according to Texas law.”  Tex. Civ. Prac. & Rem. Code Ann. §
101.021(2) (West 2011).  Conversely, the Tort Claims Act does not waive sovereign
immunity if the State would not be liable to the claimant under Texas law if it
were a private person.  Id.; see City of Fort Worth v. Robinson,
300 S.W.3d 892, 897 (Tex. App.—Fort Worth 2009, no pet.).  Thus, the Tort
Claims Act creates a unique statutory scheme in which immunity from liability
and immunity from suit are coextensive.  Miranda, 133 S.W.3d at 224; see
also Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2).

          At
issue in this case is causation.  The Department argues that Ledbetter has not
pleaded and offered evidence that the use of tangible personal property caused
John’s death.  Ledbetter responds that John died as a result of the officers’
use of restraints because “the application of the restraints onto an
unconscious and vomiting John led directly to his inability to clear his
airways and ultimately his death.”

          “Section
101.021(2) requires that for immunity to be waived, personal injury or death
must be proximately caused by the condition or use of tangible property.”  Dallas
Cnty. Mental Health & Mental Retardation v. Bossley, 968 S.W.2d 339,
343 (Tex.), cert. denied, 525 U.S. 1017 (1998).  To satisfy this
requirement, there must be “a nexus between the use of tangible property and
the plaintiff’s injuries.”  Tex. Tech Univ. Health Scis. Ctr. v. Ward,
280 S.W.3d 345, 352 (Tex. App.—Amarillo 2008, pet. denied) (citing Dallas
Area Rapid Transit v. Whitley, 104 S.W.3d 540, 542–43 (Tex. 2003)).  Ledbetter’s
pleadings are clearly sufficient to allege that the use of the restraints
caused John’s death.  Among other things, Ledbetter alleges that the “misuse of
the restraints . . . were a direct and proximate cause of John’s death,” that
the Department “[a]ffirmatively us[ed] . . . the restraining devices to
restrain John Ledbetter while he was vomiting without a way to allow him to
protect himself and without protecting him,” and that “John died because he
aspirated vomit.”  We thus focus on whether the Department’s evidence negated
causation as a matter of law and, if so, whether Ledbetter presented evidence
that the alleged misuse of the restraining devices caused John’s death.  See
id.; see also Bossley, 968 S.W.2d at 343; Brittain, 268
S.W.3d at 805.

V.  Plea
to the Jurisdiction Evidence

          The
record before the trial court at the hearing on the Department’s plea to the
jurisdiction consisted of Ledbetter’s fifth amended petition, the witness
statements attached to Ledbetter’s fifth amended petition, the Department’s plea
to the jurisdiction, and the autopsy report attached to the Department’s plea.  Because
we assume the truth of the nonmovant’s evidence when reviewing a plea to the
jurisdiction, Brittain, 268 S.W.3d at 805, we summarize the evidence in
the light most favorable to Ledbetter, the nonmovant.

          Sergeant
D. Pierce’s written statement provides that an officer escorted John into the
medical department at approximately 10 p.m. on June 27, 2008, because John had
been “removing his clothes on several occasions and walking around the dayroom.”
 The nurse on duty said that nothing could be done for John until a
psychological evaluation could be conducted the next morning, but John was moved
to a segregated cell.  In ordering John to pack his belongings to be moved,
Sergeant Pierce noted that John seemed confused.  At approximately 4 a.m. the
next morning, Sergeant Pierce saw that John “had thrown up on the floor with a
brown coffee type substance,” was lying on his bunk, and was nonresponsive.  Sergeant
Pierce wrote that John “was just lying there shaking and moving his arms and
head around.”  Sergeant Pierce then called to have John transported to the
Robertson Unit for evaluation, and officers placed John onto a gurney for the
transport and temporarily took him to the medical department.

          Sergeant
Pierce also wrote the following in his witness statement:

While in Medical, I
had Officer Skeens remove [John’s] shirt due to the liquids on it and he was
placed in transport restraints.  [John] was awake and breathing at this time[;]
he was shaking and moving his head around.  He was not talking or making any
noises. . . . When [the transport van] arrived, I along with Officer Skeens
assisted [John] into the side doors of the transport Van.  I had control of
[John]’s upper body and Officer Skeens had control of [John]’s legs and he was
lifted from the gurney to the backseat of the transport Van.  At this time I
was inside the Van and placed [John] in a lying down position on his left side
due to [his] not being able to sit up on his own and throwing up at this time. 
[John] was still moving his head and shaking at this time.  The transport team
left for the Robertson Unit with all three Officers in the front cab area due
to space limitations with [John] laying down on the only seat in the middle
section and the need to transport [him] in an urgent manner.

 

          Officer
J. Martinez wrote in his statement that he retrieved restraints after being
notified that John would be transferred to Robertson Unit and that he and other
officers “applied the transport restraints.”  According to Officer Martinez’s
statement, John was placed into the transport van “on his side to prevent
choking due to his prior vomiting.”  The transport van departed at 4:20 a.m.,
arrived at the Robertson Unit at 4:22 a.m., and pulled up to the Robertson Unit
Medical Department at approximately 4:25 a.m.  Officer Martinez wrote that John
was moaning and shaking upon arrival but that he was no longer moaning when the
officers opened the van doors.  During transport, John “had rolled himself in
between the seat where he was lying on his side.”  Officer Martinez checked
John’s pulse and “observed it to be very faint.”  Officer Martinez also helped
move John to a gurney and watched as nurses began CPR.

          Nurse
R. Mayfield’s written statement provides that John was “face down between [the]
seat and cage” when she first saw him.  Nurse Mayfield called the ambulance,
and officers removed John from the van and placed him on a gurney.  Nurse
Mayfield wrote that John’s “face and head was purple, pupils fixed and
dilated.”

          Nurse
G. Perales wrote in her statement that she heard officers say that John was not
breathing and that she “jumped [onto the] gurney and started chest compression.” 
Nurse Perales also wrote:

Told my supervisor to
get Ambubag from under gurney to give air.  Airway clear.  [Nurse] Mayfield,
LVN pushing gurney down hallway toward ER Room.  More Security arrived. 
Assisting with CPR.  Airway suctioned out.  O2 applied with Ambubag at 10 L/M. 
Patient not responding.  Skin cold and purple.  No pulse or respiration noted. 
Ambulance had been called.  CPR continued.  Paramedics arrived.  MD called at
HMC and given report told to stop CPR.  CPR in progress X 30 minutes approx. 
Heart monitors showing no cardiac activity.  Paramedics applied their heart
monitors and nothing was seen.  Hear[t] not responding.  CPR was ordered by HMC
Doctor to be discontinued.  End of CPR rescue efforts.

 

          Nurse
C. Williamson’s statement reflects that John was “lying face down between the
seat and the cage” in the transport van when she first saw him.  He was
transferred from the van to the gurney by the officers, and someone called EMS.
 Nurse Williamson also wrote:  “[John’s] color was purple on head and face,
pupils were fixed, above nipple line color was lightly red/purple and mottled.”
 John had no pulse three minutes later, but nurses continued CPR until the
paramedics arrived.  The paramedics assessed John’s condition after they
arrived and contacted Dr. Maloney who told them to stop CPR.[3]

          The
last written statement attached to Ledbetter’s petition is by inmate Jesus
Ezpinoza.  Ezpinoza wrote that the officers were not trying to help John
despite his requests for help and that they only offered him a cup of water.  Ezpinoza
further stated that the “officers finally got him some medical attention [when]
he was drooling out green stuff from his mouth.”  Ezpinoza wrote that John was
trembling when he initially walked into his cell but that his “bones were
tr[e]mbling” when the officers carried him out to the gurney.

          The
Department’s only evidence is the autopsy report.  The listed findings include
that John was “pronounced dead in infirmary following episode of
disorientation, vomiting, and convulsions (by history)” and that John had
severe atherosclerotic coronary artery disease, severe pulmonary edema and
congestion, cardiomegaly, and arteriolonephrosclerosis.  The medical examiner
listed the causes of death as “congestive heart failure due to hypertensive and
atherosclerotic cardiovascular disease” and chronic hepatitis.  The autopsy
report also stated that John’s airways were “patent, containing no foreign
objects or material.”

VI. 
Analysis

          The
Department contends that the trial court lacks subject matter jurisdiction
because Ledbetter failed to plead and prove that the use of restraints caused
John’s death and thereby failed to establish a waiver of sovereign immunity
under the Tort Claims Act.  Specifically, the Department argues that the
autopsy report establishes that John died from heart failure and that Ledbetter
has presented no evidence tending to show that John died of asphyxiation as a
result of being restrained while vomiting.

          We
conclude that the evidence in the plea to the jurisdiction record does not
conclusively disprove causation.  Although the autopsy report does not include
aspiration as an immediate or secondary cause of John’s death, we are required
to review the evidence in the light most favorable to Ledbetter, indulging
every reasonable inference and resolving any doubts in her favor.  See Brittain,
268 S.W.3d at 805.  Considered in that light, evidence other than the autopsy
report shows that John may have asphyxiated and that the restraints could have been
a proximate cause of John’s death.  John was vomiting when placed into the
transport van and was restrained while in the van.  Sergeant Pierce wrote in
his statement that John was placed “in a lying down position” in the transport
van because he could not sit up on his own and was “throwing up at this time.”  Viewing
the evidence in the light most favorable to Ledbetter, a reasonable inference
may be drawn that John was vomiting after he was placed in the van.  Although
Officer Martinez’s statement provides that John was placed on his side to
prevent choking, there is no evidence that John did not continue vomiting en
route to the Robertson Unit as no one rode in the back of the van with John to
observe his condition during the transport.  In addition, all three nurses
noted that, upon arrival at the Robertson Unit, John’s coloring was purple.  Nurse
Perales wrote in her statement that she was called by Nurse Mayfield to help
while the officers were removing John from the van.  She heard them say, “He is
not breathing.”  She then “jumped up gurney and started chest compression” and
told her supervisor to give John air.  She then wrote that John’s airway was
clear, all of this occurring as Nurse Perales was continuing CPR and as Nurse
Mayfield was pushing the gurney toward the emergency room.  John’s airway was
then suctioned.

          Applying
the appropriate standard of review, Nurse Perales’s statements that John’s
airway was clear and was suctioned out do not conclusively negate the
possibility that John’s airway was obstructed when Nurse Perales began CPR upon
John’s arrival at the Robertson Unit.  See Miranda, 133 S.W.3d at 228; Brittain,
268 S.W.3d at 805.  The Department relies on the statement in the autopsy
report that John’s airway was open, clear, and “contain[ed] no foreign objects
or material,” but the suctioning of John’s airway would explain the medical
examiner’s failure to find obstructions in John’s airway when he performed the
autopsy later that day.  Thus, in the absence of affirmative evidence offered
by the Department that John’s physical symptoms upon arrival at the Robertson
Unit were not consistent with asphyxiation, the evidence does not conclusively
disprove Ledbetter’s theory that John asphyxiated on vomit as a result of being
restrained in the transport van.

          Applying
the appropriate standard of review and thus reviewing the plea to the
jurisdiction evidence in the light most favorable to Ledbetter, we hold that
the evidence does not conclusively show that the Department’s use of restraints
was not a proximate cause of John’s death.  See generally Brittain, 268
S.W.3d at 808 (“The causation requirement in section 101.021(2) is one of
proximate cause-not a heightened standard such as sole cause.”).  Although the
evidence arguably preponderates against a conclusion that the restraints
proximately caused John’s death in that he was apparently suffering from a
cardiac event prior to being restrained and was determined to have died as a
result of congestive heart failure, the evidence does not conclusively negate
the use of restraints as a proximate cause of John’s death and is likewise
conflicting as to whether the Department’s use of restraints was, although not
the sole cause, a proximate cause of John’s death.  The trial court therefore did
not err by denying the Department’s plea to the jurisdiction.  We overrule the
Department’s sole issue.

VII. 
Conclusion

          Having
overruled the Department’s sole issue, we affirm the trial court’s order.

 

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER, MCCOY, and MEIER, JJ.

 

DELIVERED:  December 21,
2012








 









[1]See Tex. R. App. P. 47.4.





[2]Ledbetter has not appealed
the trial court’s partial grant of the Department’s plea to the jurisdiction.





[3]John was pronounced dead
at 5:03 a.m.  His hand restraints were removed at 7:02 a.m.